UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

KONSTANTINOS IOANNIS
KATSIROUMBAS,

        Appellant,

        -v-                                  5:18-CV-972

FRANK H. SUITS, JR.,

        Appellee.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| APPEARANCES: | OF COUNSEL: |
|---|---|
| ORVILLE & MCDONALD LAW, P.C.<br>Attorneys for Appellant<br>30 Riverside Drive<br>Binghamton, NY 13905 | ZACHARY D. MCDONALD, ESQ. |
| CROSSMORE LAW FIRM<br>Attorneys for Appellee<br>115 West Green Street<br>Ithaca, NY 14850 | EDWARD Y. CROSSMORE, ESQ. |

DAVID N. HURD
United States District Judge

## **MEMORANDUM–DECISION and ORDER**

## I. **INTRODUCTION**

Appellant Konstantinos Ioannis Katsiroumbas ("Katsiroumbas" or "debtor"), a chapter 7 bankruptcy debtor, appeals from an August 1, 2018 Memorandum–Decision and Order (the "August MDO") issued by United States Bankruptcy Judge Margaret Cangilos–Ruiz that denied him a discharge of certain debts after appellee Frank H. Suits, Jr. ("Suits" or "creditor"), a judgment creditor, objected to the discharge. *In re Katsiroumbas*, 589 B.R. 36

(Bankr. N.D.N.Y. 2018). The appeal has been fully briefed and will be decided on the basis of the submissions without oral argument.

## II. BACKGROUND[1]

Katsiroumbas is a restaurateur and businessman. In 2006, debtor sold off A-1 Restaurant, a pizzeria he owned in Dryden, New York, for $1.5 million. The parties to the sale agreed to split up the proceeds using two different contracts.

First, the buyer shelled out $850,000 at the time of purchase. The parties recorded this payment using a standard purchase and sale contract written in English and memorialized on standard New York State real estate transfer forms.

Second, the buyer promised to pay off the remaining $650,000 balance in 84 monthly installments of $9,600 at 6 percent interest. The parties memorialized this part of the deal in a private agreement written in Greek, executed in Greece, and secured by a mortgage on property located in Greece (the "Note").

After selling off the pizzeria, Katsiroumbas tried his hand at investing in other business ventures. First, debtor helped out two other entrepreneurs by pouring a substantial sum of money—by his own estimation, about $500,000—into Brix Pubaria, a bar and restaurant in Cortland, New York. However, the relationship between debtor and his co-investors soured and they tried to push him out of the shared enterprise. According to debtor, litigation over ownership of that restaurant remains pending.

In the spring of 2014, still reeling from being booted out of Brix Pubaria, Katsiroumbas borrowed about $289,000 from Suits to open La Piazza, a restaurant in Syracuse, New

---

[1] The background recounted here is drawn from the parties' submissions and a review of the portions of the record designated on appeal.

York. However, the business bled money right from the start and debtor was forced to close the restaurant in November of that year.

On May 18, 2015, apparently as a result of his investment in the failed La Piazza venture, Suits recovered money judgments in state court against Katsiroumbas for $341,063.52 and $66,711.71. Debtor partially satisfied the latter judgment. Thereafter, debtor made ends meet by working at other restaurants, selling off another property he owned, and accepting a buyout of a mortgage he held on another. Debtor also helped his uncle, Peter Constantine, open and operate Bravo, a pizzeria located in Freeville, New York.

On December 28, 2016, seeking a fresh start and a way to rid himself of liability for the substantial money judgment he still owed to Suits, Katsiroumbas filed a chapter 7 bankruptcy petition. As one might expect, creditor sought to block debtor's gambit. Creditor filed an adversary complaint in the bankruptcy case and sought an order denying debtor a discharge of his debts. In that filing, creditor argued debtor had falsified certain records associated with his financial condition, made false statements in connection with his bankruptcy case, or otherwise failed to explain the disposition of certain estate assets.

On March 20, 2018, U.S. Bankruptcy Judge Margaret Cangilos–Ruiz held a one-day bench trial on Suits's objection to Katsiroumbas's discharge. Judge Cangilos–Ruiz heard testimony from seven witnesses and received extensive documentary evidence into the record, including sworn depositions taken in prior proceedings. *In re Katsiroumbas*, 589 B.R. at 40 n.2 (detailing evidentiary record and submissions considered).

At trial, the parties principally disputed whether Katsiroumbas: (1) possessed an

undisclosed ownership interest in Bravo at the time he filed for bankruptcy[2]; (2) received money for work performed at Bravo that he did not disclose in his bankruptcy filing; and (3) properly disclosed any pending or outstanding payments that remained due on the Note.

For his part, Katsiroumbas acknowledged that he received "substantial payments" on the Note between 2006 and 2013, but insisted that further installment payments ceased in 2013, well before he filed for bankruptcy. In July of that year, debtor and the counter-party reached a "satisfaction agreement" on a final, lump sum payment that would fully discharge the Note.

As for his alleged ownership interest in Bravo, Katsiroumbas admitted that he helped his uncle start the business and conceded that he performs "many roles" on a day-to-day basis, but insisted that he received just three $500 paychecks (which he properly disclosed on his filing) when the restaurant first opened. Instead of money, debtor claimed that he now receives free meals at the restaurant.

Suits introduced evidence tending to show that Katsiroumbas's story was false or misleading. Among other things, creditor showed that debtor had under-reported payments from the Note to the Internal Revenue Service. Creditor argued that this and other related evidence suggested debtor had hidden away some amount of cash from the deal. Creditor also introduced evidence that Mr. Constantine, debtor's uncle, might well have been only a figurehead for Bravo, with debtor himself in full control of the restaurant behind the scenes.

On this point, Suits demonstrated that Katsiroumbas himself possessed authorization to sign checks on Bravo's bank account and handled the permitting process with the county

---

[2] Katsiroumbas's uncle gave him sole legal ownership of Bravo about seven months after he filed for bankruptcy.

health department.  Further evidence showed that a large portion of Bravo's transactions are in cash, that the restaurant's process for handling and tracking these cash payments is not rigorous, and that debtor had regular access to the stream of cash moving between the restaurant's registers and the restaurant's bank account.

On August 1, 2018, after post-trial briefing, Judge Cangilos–Ruiz issued an order finding Katsiroumbas ineligible for discharge.  The August MDO rejected Suits's claim that debtor had concealed an ownership interest in Bravo or stashed away additional cash compensation flowing from his work at the restaurant.  The August MDO also rejected creditor's claim that debtor lied about receiving additional compensation from the Note.

However, the August MDO found that Katsiroumbas produced contradictory and incomplete evidence of his financial condition.  The August MDO also found that debtor's declarations of ignorance regarding his own finances were untruthful and that debtor had "deliberately obfuscated his affairs."  Accordingly, Judge Cangilos–Ruiz denied debtor a discharge.  This appeal followed.

## III.  **DISCUSSION**[3]

On appeal, Katsiroumbas argues the bankruptcy court clearly erred in finding the documentary and testimonial evidence of his financial condition to be insufficient and his justification for certain irregularities to be unavailing.  Debtor contends that these errors are closely related to the court's unreasonable application of a ten-year "lookback" period.  Further, debtor argues that the bankruptcy court clearly erred in finding certain of his

---

[3]  A federal district court has jurisdiction to hear appeals from "final judgments, orders, and decrees" issued by a bankruptcy court sitting in the same judicial district. 28 U.S.C. § 158(a).  "Generally in bankruptcy appeals, the district court reviews the bankruptcy court's factual findings for clear error and its conclusions of law de novo." *In re Charter Commc'n, Inc.*, 691 F.3d 476, 482-83 (2d Cir. 2012).

deposition statements false or misleading.

Suits responds that the bankruptcy court's findings of fact are grounded in a detailed and exhaustive analysis that takes into account even obscure factors, like Katsiroumbas's depression. Creditor argues that the bankruptcy court recognized the seriousness of denying debtor's discharge but correctly concluded that such an extreme sanction was warranted in light of debtor's misconduct.

"One of the central purposes of the Bankruptcy Code and the privilege of discharge is to allow the 'honest but unfortunate debtor' to begin a new life free from debt." *In re Cacioli*, 463 F.3d 229, 234 (2d Cir. 2006) (quoting *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991)). Thus, a denial of discharge under § 727 is an extreme penalty that "must be construed strictly against those who object to the debtor's discharge and 'liberally in favor of the bankrupt.'" *Id*. (quoting *State Bank of India v. Chalasani*, 92 F.3d 1300, 1310 (2d Cir. 1996)). "In the interest of protecting creditors, however, § 727 requires the denial of discharge under ten enumerated circumstances." *Id*. (citing 11 U.S.C. § 727(a)).

The August MDO denied Katsiroumbas discharge on two of these ten enumerated grounds. First, Judge Cangilos–Ruiz found that debtor had produced contradictory and incomplete evidence of his financial condition. Accordingly, the bankruptcy court denied discharge under § 727(a)(3), which is appropriate if:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]

11 U.S.C. § 727(a)(3).

"The purpose and intent of [§ 727(a)(3)] of the Bankruptcy Act is to make the privilege of discharge dependent on a true presentation of the debtor's financial affairs." *In re Cacioli*, 463 F.3d at 234 (quoting *In re Underhill*, 82 F.2d 258, 260 (2d Cir. 1936)). "The statute also ensures that the trustee and creditors are supplied with dependable information on which they can rely in tracing a debtor's financial history." *Meridian Bank v. Alten*, 958 F.2d 1226, 1230 (3d Cir. 1992).

Thus, § 727(a)(3) "implicitly casts an affirmative duty on debtors not to destroy and to keep and preserve records from which the debtor's financial condition or business transactions might be ascertained." *In re Devaul*, 318 B.R. 824, 830 (Bankr. N.D. Ohio 2004) (citation and internal quotation marks omitted).

However, "it is not a debtor's burden to prove in § 727(a)(3) litigation that this implied statutory duty has been performed. Rather, it is the creditor's burden to prove the debtor's statutory duty has *not* been performed." *In re Devaul*, 318 B.R. at 830 (emphasis in original).

"To implement this record-keeping requirement, § 727(a)(3) provides a two-step approach." *In re Cacioli*, 463 F.3d at 235. "The initial burden lies with the creditor to show that the debtor failed to keep and preserve any books or records from which the debtor's financial condition or business transactions might be ascertained." *Id*. (citing *White v. Schoenfeld*, 117 F.2d 131, 132 (2d Cir. 1941)).

"If the creditor shows the absence of records, the burden falls upon the bankrupt to satisfy the court that his failure to produce them was justified." *In re Cacioli*, 463 F.3d at 235 (citing *White*, 117 F.2d at 132); *see also In re Sandow*, 151 F.2d 807, 809 (2d Cir.1945) ("The statute puts the burden squarely upon the bankrupt who produces no financial records to produce at least a satisfactory explanation of their absence.").

At the first step, the "adequacy" of a debtor's record-keeping is evaluated in light of eight, non-exhaustive factors: "(1) whether the debtor was engaged in business, and if so, the complexity and volume of the business; (2) the dollar amount of the debtor's obligations; (3) whether the debtor's failure to keep or preserve books and records was due to the debtor's fault; (4) the debtor's education, business experience, and sophistication; (5) the customary business practices, for record keeping in the debtor's type of business; (6) the degree of accuracy disclosed by the debtor's existing books and records; (7) the extent of any egregious conduct on the debtor's part; and (8) the debtor's courtroom demeanor." *In re Antoniou*, 527 B.R. 71, 78–79 (Bankr. E.D.N.Y. 2015) (quoting *State Bank of India v. Sethi*, 250 B.R. 831, 838 (Bankr. E.D.N.Y. 2000)); *see also In re Cacioli*, 463 F.3d at 236 n.9 (clarifying that the test in *Sethi* is used to evaluate the adequacy of a debtor's records and not for judging the credibility of any justification offered at step two); *In re Devaul*, 318 B.R. at 831 (describing how the proper tests at step one and step two have often become "conflated and confused").

At the second step, "the burden shifts to the debtor to justify the absence of comprehensive records under all relevant circumstances." *In re Antoniou*, 527 B.R. at 80. However, "the Bankruptcy Code does not define what constitutes justification for a failure to maintain records under § 727(a)(3)." *In re Cacioli*, 463 F.3d at 235. Instead, the Second Circuit has explained that courts should carefully consider the particular circumstances present in each case and ask "what a normal, reasonable person would do under similar circumstances." *Id.*

In other words, "[i]t is a 'loose test, concerned with the practical problems of what can be expected of the type of person and type of business involved.'" *In re Cacioli*, 463 F.3d at

235 (quoting *Morris Plan Indus. Bank of N.Y. v. Dreher*, 144 F.2d 60, 61 (2d Cir. 1944)); *see also Sethi*, 250 B.R. at 839 ("Debtors have a duty to preserve those records that others in like circumstances would ordinarily keep."). The Second Circuit has approved of a list of factors that courts should consider when evaluating the credibility of a debtor's "justification" at step two:

> the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; the amount of credit extended to debtor in his business; and any other circumstances that should be considered in the interest of justice.

*In re Cacioli*, 463 F.3d at 237 (quoting *Meridian Bank*, 958 F.2d at 1231). In sum, "[a] debtor's stated justification will satisfy § 727(a)(3) if enough evidence exists to convince the court of [the debtor's] good faith and businesslike conduct." *In re Antoniou*, 527 B.R. at 80 (citation and internal quotation marks omitted) (alteration in original).

Katsiroumbas contends the August MDO misapplied this body of case law to the circumstances of this case. According to debtor, the bankruptcy court made two, related errors: first, it acted unreasonably in "looking back" over the past ten years of debtor's records and second, it erred in concluding that he produced inadequate documentation to establish his financial status in the run up to his bankruptcy filing.

Katsiroumbas's argument is premised on an important detail about § 727(a)(3) that might be easy to miss: the provision is not concerned with the broader question of whether a debtor might have been guilty of being a poor record-keeper throughout his financial life. Rather, the provision applies only if a debtor's more recent record-keeping behavior (or misbehavior, as the case may be) renders it impossible to get a clear picture of his financial condition as it stood on the date he filed his bankruptcy petition. *In re Kran*, 493 B.R. 398,

404 (S.D.N.Y. 2013), *aff'd*, 760 F.3d 206 (2d Cir. 2014).

Of course, this inquiry necessarily involves some examination of a debtor's pre-petition record-keeping behavior. But as with most things, the question of how far a bankruptcy court should "look back" in time depends on the particular facts and circumstances of each case. *See In re Kran*, 493 B.R. at 404-05 (rejecting the notion that § 727(a)(3) is an "indefinite penalty for any kind of past malfeasance").

As Katsiroumbas points out, "[i]n the ordinary consumer bankruptcy case, it is probably reasonable to limit an inquiry [under § 727(a)(3)] to a period of two years before the commencement of the case[.]" *In re Losinski*, 80 B.R. 464, 474 (Bankr. D. Minn. 1987).

But it is true too, as Suits points out, that the Code does not set "a hard-and-fast rule limiting the inquiry to events and transactions occurring within a specific number of months or years before the bankruptcy case." *In re Losinski*, 80 B.R. at 474.

For instance, a longer period might be appropriate if evidence suggested "earlier fraudulent transfers or other sanctionable or avoidable dissipation of assets." *In re Losinski*, 80 B.R. at 474. Thus, "[a]lthough a focus on the two years prior to the debtor's petition filing may be common, inquiries extending beyond two years certainly occur when warranted." *In re Racer*, 580 B.R. 45, 55 (Bankr. E.D.N.Y. 2018).

As relevant here, the existence of "'lost assets of substantial value relative to debtors' liabilities' often warrants the extension of such two-year period." *In re Losinski*, 80 B.R. at 474 (quoting *In re Stiff*, 512 B.R. 893, 898 (Bankr. E.D. Ky. 2014)). Judge Cangilos–Ruiz found that the "repayment status" of the Note fell within the scope of § 727(a)(3) even though the evidence strongly indicated that the final payments occurred in July 2013, "just over three years before the petition date." *In re Katsiroumbas*, 589 B.R. at 46.

As the bankruptcy court explained, the Note's repayment status was relevant under the particular circumstances of this case because it involved a large amount of money coming into the hands of a "highly experienced restauranteur and small business owner." *In re Katsiroumbas*, 589 B.R. at 46. Under those circumstances, Judge Cangilos–Ruiz concluded that "a reliable record of $9,600 monthly payments would be reasonable to expect." *Id*.

Katsiroumbas essentially argues that this was unfair or, as he puts it, "requiring [him] to maintain precise records for over a ten year period of unreasonable." But debtor's argument about "precise records" mischaracterizes the bankruptcy court's expectations on this score. To the contrary, Judge Cangilos–Ruiz clearly explained that:

> Though the court does not demand that any one source of evidence fully explain the Note's status, all the proffered non-contemporaneous evidence is unreliable or conclusory in light of other evidence, and contemporaneous evidence only accounts for a small fraction of payments on the Note. On the basis of that shortcoming and the inconsistencies in Debtor's records, the court finds that [Suits] has carried his burden to show that records maintained by Debtor are inadequate.

*In re Katsiroumbas*, 589 B.R. at 46.

Although a two-year "lookback" period may be common in run-of-the-mill bankruptcy cases, "[i]t is up to the bankruptcy court's broad discretion to determine on a case by case basis whether the records produced by the debtor are sufficient." *In re Sethi*, 250 B.R. at 838.

In this case, the bankruptcy court determined that a longer "lookback" period was necessary for the limited purpose of tracing payments received from a single source in connection with a single, substantial transaction. The bankruptcy court determined that this

- 11 -

made sense under the circumstances because, apart from the complexity of Katsiroumbas's restaurant business, the repayment schedule on the Note was basically debtor's only source of non-restaurant installment income. *In re Katsiroumbas*, 589 B.R. at 46-47 ("There is no evidence that the volume and complexity of Debtor's non-restaurant installment income is so great that a record of payments would be a high bar."). Upon review, there is no error, clear or otherwise, in this determination. Accordingly, the August MDO's denial of discharge under § 727(a)(3) will be affirmed.

The August MDO also found that Katsiroumbas's declarations of ignorance regarding his own finances were untruthful and that debtor had "deliberately obfuscated his affairs." *In re Katsiroumbas*, 589 B.R. at 50.

Under § 727(a)(4)(A), discharge may be denied if "the debtor knowingly and fraudulently" made a "false oath or account" that is "in or in connection with the case." 11 U.S.C. § 727(a)(4)(A). As the August MDO noted, a creditor objecting to discharge on this basis bears the burden of establishing that: (1) the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case. *In re Katsiroumbas*, 589 B.R. at 49; *see also In re DeMartino*, 448 B.R. 122, 127 (Bankr. E.D.N.Y. 2011) (setting forth same standard).

Katsiroumbas accuses the bankruptcy court of making "several sweeping assertions" about his truthfulness that are "specifically contradict[ed]" by the record. According to debtor, the bankruptcy court read too much into debtor's confusion about some of the issues, improperly concluding that his ignorance of certain matters signaled an attempt to deceive.

That assertion might be true in a vacuum. But that is not how the bankruptcy court

saw things. As Suits points out, in addition to her more "sweeping" observations about the various shortcomings in Katsiroumbas's sworn testimony, Judge Cangilos–Ruiz also made specific findings about specific statements, finding several to be "demonstrably false." *In re Katsiroumbas*, 589 B.R. at 49-50. The bankruptcy court further found that debtor knew that these statements were false, that they were made with the requisite fraudulent intent, and that they were "directly related" to his bankruptcy. *Id*. at 50.

Katsiroumbas's brief, which offers explanations and excuses for the various problems the bankruptcy court identified with his testimony and other sworn statements, makes plain that he wants this Court to second-guess Judge Cangilos–Ruiz's findings about his credibility and his subjective intent.

There is no reason to do so. The bankruptcy court was in the best position to make those determinations, and a review of the record, including the trial transcript, confirms that the bankruptcy court made those determinations in a reasonable manner. *See, e.g., In re DeMartino*, 448 B.R. 122, 128 (Bankr. E.D.N.Y. 2011) ("Fraudulent intent is rarely susceptible to direct proof and may therefore be proven by circumstantial evidence or inferences from a course of conduct.").[4] Accordingly, the August MDO will be affirmed.

## IV. <u>CONCLUSION</u>

Therefore, it is

ORDERED that

1. The August 1, 2018 MDO is AFFIRMED; and

---

[4] To the extent Katsiroumbas faults the bankruptcy court for not giving sufficient notice of its intent to consider § 727(a)(4)(A) in connection with his prior deposition testimony regarding the Note, that argument is rejected. The relevant evidence was properly before the court and the facts surrounding the Note were adequately developed by the parties at trial.

2. Katsiroumbas's appeal is DENIED.

The Clerk of the Court is directed to close the file.

IT IS SO ORDERED.

Dated: April 16, 2019
      Utica, New York.

_____
United States District Judge